#065698

ORIGINAL

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

FILED
NOV 16 2006
U.S. COURT OF FEDERAL CLAIMS

HENSEL PHELPS CONSTRUCTION CO. *

Plaintiff, *

v. * Case No.: 06-774 C
Judge:

THE UNITED STATES OF AMERICA *

Defendant. *

* * * * * * * * * * * * *

**COMPLAINT**

Plaintiff, Hensel Phelps Construction Co. ("Hensel Phelps"), for the use and benefit of their subcontractor, Hudak's Construction Services, Inc. ("Hudak's"), by its undersigned counsel, Roger C. Jones, of Huddles, Jones, Sorteberg & Dachille, P.C., sues the United States of America ("United States"), and for its Complaint in the above matter, respectfully states as follows:

**Jurisdiction**

1. This Court has jurisdiction pursuant to 28 U.S.C. § 1491. Plaintiff brings this action pursuant to the Contract Disputes Act of 1978, as amended, 41 U.S.C. § 601 *et seq.*

**The Parties**

2. Plaintiff, Hensel Phelps is a general contractor in the construction industry organized and existing under the laws of the State of Delaware, with its principal place of business located at 420 6th Ave., P.O Box 2440 Greeley, Colorado 80632.

3. Hudak's, is a subcontractor in the abatement and demolition industry organized and existing under the laws of the State of Maryland, with its principal place of business located at 8229 Pulaski Highway, Baltimore, Maryland 21237.

4. Defendant is the United States of America.

## The Contract

5. On April 10, 2003, the United States, by and through the General Services Administration awarded Hensel Phelps Construction Co. a contract (the "Prime Contract") (Contract No. GS-03P-03-DCX-0024) for the repair and restoration of the Social Security Administration Operations Building (the "Project"), located at Headquarters Campus, 6401 Security Blvd., Woodlawn, Maryland. The Contract is incorporated by reference herein, but is not attached due to its voluminous nature. Defendant has a copy of the Contract in its possession.

6. On May 21, 2003, Hudak's received from Hensel Phelps a letter of intent concerning its subcontract for the performance of the abatement and demolition work on the project. Thereafter, by subcontract dated November 7, 2003, Hudak's was contracted to perform the demolition and hazardous material abatement work on the Project, required by Hensel Phelps' Prime Contract.

## The Certified Claim

7. This action relates to a July 7, 2006 Certified Claim submitted by Hensel Phelps to the Contracting Officer (the "Certified Claim") pursuant to the Disputes Clause in the Contract. By way of the Certified Claim, Hensel Phelps submitted Hudak's June 26, 2006 Amended and Re-Certified Claim in the amount of $766,352 (the "Hudak's Claim"), plus Hensel Phelps contractually allowed mark-up thereon, to the Contracting Officer as a pass-through claim. A copy of the Certified Claim package, including the Hudak's Claim, is attached as **EXHIBIT 1**.

8. To date, despite the fact that more than 60 days has elapsed since submission of the Certified Claim, the Contracting Officer has failed to issue a Final Decision on the Certified Claim. As such, the Certified Claim is deemed denied.

## Factual Background for the Claim For Equitable Adjustment

9. As described in Prime Contract Specification Section 01010, the renovation and restoration of the Social Security Operations Building included, among other things: the replacement of existing building facades; re-roofing the building; providing new interior finishes; providing new mechanical, electrical and fire protection systems and a new water distribution system.

10. The majority of the Building was 5 levels in height and, for purposes of construction, the work was to be performed in 2 phases in accordance with the Government's designed phasing plan. While work was being performed in Phase 1, the Government would continue to occupy the building in the Phase 2 area. Then, when work was completed in Phase 1, the Government would occupy the Phase 1 work area, while the Phase 2 work was being performed.

11. The Phase 1 work has been substantially completed and, as of the date of this appeal, the Phase 2 work is currently ongoing.

12. The Certified Claim and Hudak's Claim is for additional costs stemming from impact to Hudak's labor productivity, in the performance of its abatement and demolition work on Phase 1 of the Project, was caused by and is the result of the Government's actions.

**A. Hudak's Planned Phase 1 Work Performance**

13. Hudak's original plan to perform the Phase 1 work was premised upon performing its abatement and demolition work in large areas of the project at one time. The reason for this plan stems from Part I of Specification Section 01010, ¶ 1.3, which indicated the contractor would have full use of the designated construction area for each phase of the work.

14. As planned, the duration for Hudak's Phase I abatement and demolition work was to span the course of one year, from October 20, 2003 to October 20, 2004 (i.e. 367 calendar days). Hudak's believed the overall duration for its abatement and demolition work in each area, and for Phase I as a whole, was adequate and reasonable. Hudak's also believed its work would proceed in an orderly, efficient and timely fashion. To do so, the following was of paramount importance:

1. Having almost totally unfettered access to the entire Phase I area of the building;
2. Having utilities "cut and capped" ahead of Hudak's demolition work;
3. Having an exterior trash chute installed at the outset of demolition activities; and
4. Having the ability to perform abatement and demolition activities in a contiguous and continuous fashion.

15. Pursuant to the Government's phasing plan, the Phase 1 work area for the project was divided into several sub-areas, depicted as follows:




16. In accordance with Hensel Phelps' baseline schedule, Hudak's work in areas H, F, D & B was planned to be performed between early November 2003 and mid May 2004. Thereafter, the Area K and J (Kitchen / Servery / Dining Room Areas) (Phase 1A) abatement and demolition work was planned to be performed between mid August 2004 and late October 2004. The sequence of Hudak's work was to be: (1) Pre-Abatement Demolition; (2) Abatement; and (3) Demolition. Also, work was to be performed in interior spaces first; followed by demolition of exterior walls.

**B. Hudak's As-Built Phase 1 Performance**

16. Hudak's Phase 1 work on the project did not proceed as expected or planned. Nor did Hudak's work proceed as was envisioned in the baseline schedule. Instead, Hudak's work had to be performed in a disrupted, piecemeal, out-of-sequence, delayed and inefficient fashion. In addition, Hudak's work was subjected to a multitude of Government changes, which had a cumulative impact on Hudak's ability to perform the base contract work in an efficient fashion.

17. Although Hudak's abatement and demolition work substantially commenced in November 2003, the work continued through December 2004; contrary to the plan for Hudak's Phase 1 work, which should have been complete by late October 2004. The time frame between November 2003 and December 2004 has been analyzed and broken down into two distinct claim periods:

Claim Period 2: November 1, 2003 through August 31, 2004; and

Claim Period 3: September 1, 2004 through December 31, 2004.[1]

18. The causes for the impact to Hudak's abatement and demolition work were numerous. The defective design with respect to the Government's phasing scheme, and the numerous differing conditions encountered, resulted in an enormous amount of changes. The cumulative impact from these changes was devastating to Hudak's ability to perform work in an efficient and productive fashion.

**1. <u>Impacted Phase 1 Abatement Work</u>**

19. Commencing in mid-November 2003, Hudak's was able to begin limited abatement work in Area H. On a planned basis, the abatement work in Area H should have

---

[1] Claim Period 1, excluded from the Hudak's Re-Certified Claim, spanned the time frame between June 1, 2003 through October 31, 2003. Likewise, Claim Period 4, excluded from the Hudak's Re-Certified Claim, spanned the time frame between January 1, 2005 through June 30, 2005.

proceeded in the entire area at the same time. However, work could not proceed in this fashion because pre-abatement work could not be completed due to the inability to cut and cap existing mechanical and electrical systems in order to make the area safe for abatement (and subsequent demolition). This problem occurred because, despite the Government's designed phasing plan, the mechanical and electrical services serving Area G in the Phase II portion of the project ran through Area H in the Phase I portion of the project.

20. Further, the cut and cap process was impacted by the Government's need for a two-week notice before any systems could be shut down for cutting and capping purposes. Specification Section 01040, Part 1, ¶ 1.9 of the Contract required only 72 hour notice.

21. As a result of these impact factors, the abatement process in Areas H, D and B was required to be performed in small sections at a time, which became available in a piecemeal fashion. In turn, the piecemeal nature of the abatement process necessitated performing demolition work in an equally piecemeal fashion, side-by-side with the abatement work throughout Phase I, as areas became available.

22. This highly segmented and inefficient sequence of work resulted in other impacts stemming from construction dust permeating abatement containment areas. In turn, this caused a great deal of retesting and recleaning of abatement areas; resulting in both additional cost to both Hudak's and to the Government's testing agency. These issues precluded Hudak's work from being completed in an efficient fashion and resulted in significant time impacts to Hudak's ability to perform abatement work and subsequent demolition work in accordance with the baseline schedule. Until an abatement area was deemed acceptable by the Government's testing agency, subsequent demolition work in the area could not proceed.

**a. Cumulative Impact Stemming From Abatement Change Work**

23. The impacts from the requirement to perform abatement work in this piecemeal fashion were compounded by the significant abatement change work necessitated by differing conditions. In turn, the performance of this change work impacted the performance of Hudak's unchanged base contract work. The charts below illustrate the months during Claim Periods 2 and 3 where excessive change work had to be performed at the same time as Hudak's base contract work:

| | Period Two | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| **Abatement** | | | | | | | | | | |
| | **Nov-2003** | **Dec-2003** | **Jan-2004** | **Feb-2004** | **Mar-2004** | **Apr-2004** | **May-2004** | **Jun-2004** | **Jul-2004** | **Aug-2004** |
| Actual Hours | 3,631 | 6,621 | 4,845 | 4,758 | 6,290 | 4,620 | 4,308 | 2,668 | 1,202 | 3,286 |
| Change Order Hours | 50 | 1,150 | 872 | 1,031 | 1,997 | 739 | 786 | 167 | 0 | 0 |
| Adjusted Actual Hours | 3,581 | 5,471 | 3,973 | 3,727 | 4,293 | 3,882 | 3,523 | 2,501 | 1,202 | 3,286 |
| | | | | | | | | | | |
| % Complete | 8.56% | 18.53% | 13.69% | 10.97% | 20.94% | 9.19% | 1.56% | 0.89% | 0.86% | 1.18% |
| Earned Hours | 3,116 | 6,745 | 4,983 | 3,993 | 7,622 | 3,345 | 568 | 324 | 313 | 430 |
| | | | | | | | | | | |
| **Abatement Over Run Hours** | **(465)** | **1,274** | **1,010** | **266** | **3,329** | **(536)** | **(2,955)** | **(2,177)** | **(889)** | **(2,856)** |
| | | | | | | | | | | |
| **Adjusted Actual Hours** | **35,438** | | | | | | | | | |
| | | | | | | | | | | |
| **Earned Hours** | **31,439** | | | | | | | | | |
| | | | | | | | | | | |
| **Overrun Hours** | **(3,999)** | | | | | | | | | |

| | Period Three | | | |
|---|---|---|---|---|
| **Abatement** | | | | |
| | Sep-2004 | Oct-2004 | Nov-2004 | Dec-2004 |
| Actual Hours | 5,352 | 2,758 | 1,410 | 480 |
| Change Order Hours | 0 | 751 | 440 | 493 |
| Adjusted Actual Hours | 5,352 | 2,008 | 970 | (13) |
| | | | | |
| % Complete | 7.64% | 5.03% | 0.66% | 0.28% |
| Earned Hours | 2,781 | 1,831 | 240 | 102 |
| | | | | |
| **Abatement Over Run Hours** | **(2,571)** | **(177)** | **(730)** | **114** |
| | | | | |
| **Adjusted Actual Hours** | **8,317** | | | |
| | | | | |
| **Earned Hours** | **4,954** | | | |
| | | | | |
| **Overrun Hours** | **(3,363)** | | | |

24. Some of the significant changes affecting Hudak's abatement work included the following:

**(i) Façade Abatement Change Work**

25. The contract documents for the project did not identify how much, if any, exterior block wall abatement work would have to be performed. Likewise, they did not indicate how such abatement work would be performed if, in fact, it was necessary.

26. Ultimately, when it was decided that all of the exterior block wall would be abated, the change work to perform this abatement had a significant impact on Hudak's other contract work.

27. Due to the need for immediate erection of exterior precast, Hudak's was directed to perform the exterior wall demolition and abatement work prior to performing interior abatement and demolition work. Given the nature of demolition work, it is important (and standard practice) to contain an area where demolition work is being performed so that it is not

subject to weather elements as the work is being performed. On this project, however, the opposite occurred in order to facilitate the time consuming exterior block wall change work. Instead of performing the interior abatement and demolition work before the façade abatement and demolition work, the façade abatement and demolition work had to proceed first. In turn, this meant Hudak's interior abatement and demolition work was subject to weather elements and winter working conditions, which contributed to the labor impacts that were experienced by its work crews.

**(ii) Raised Access Flooring Abatement Work**

28. Another significant abatement change involved approximately 40,000 square feet of raised access flooring that was determined to have asbestos tiles. The performance of this change work as well as the follow-on base contract work was seriously disrupted by the existence of electrical conduit and cabling under the raised access floors. In order to abate the raised access floors, Hudak's had to go through a time consuming process of having each conduit and cable checked and decommissioned, which substantially prolonged not only the performance of the abatement change work but also the follow-on demolition work

29. In addition, as Hudak's was performing the raised access flooring abatement change work, it also became necessary to perform change work to abate existing carpet on top of the raised access floor, which could not be separated from the asbestos containing floor tiles.

**b. Impacted Abatement Work in the Kitchen / Servery / Dining Room Areas**

30. The loss of labor productivity with respect to Hudak's abatement work activities and the cumulative impact stemming from Government directed changes continued through Claim Period 3. When the Area J & K Kitchen work areas became available in the fall of 2004, a large amount of abatement change work again had to be performed during October, November

and December. As a result, Hudak's again experienced a significant amount of impact to labor productivity and a significant labor hour overrun during this time period.

**2. Impacted Phase 1 Demolition Work**

31. Like the impact experienced in performing Hudak's abatement work, Hudak's demolition work was also disrupted, impacted and delayed by several factors.

**a. Lack of Trash Chute Impact**

32. Pursuant to Specification Section 01040, Part 3, Paragraph 3.4.E of the Prime Contract, exterior trash chutes were to be erected on the South side of Area H and the West wall of Area D. The contemplated use of trash chutes on these facades was critical for both timely and efficient performance of Hudak's demolition work. Without trash chutes, all demolition debris had to be carted to an elevator, transported to the ground level and then carted to a dumpster. The handling of debris in such a fashion was extremely time consuming and labor intensive. It is much easier to dump a wheelbarrow of debris out a large opening in a façade and have it fall through a trash chute, directly into a dumpster, than it is to manipulate a wheelbarrow full of debris through hallways and elevators, that are being utilized by other trades, and out to a dumpster.

33. To construct the trash chutes, Hudak's needed to erect a vertical steel frame on each floor running from floor slab to ceiling slab. To do so, the façade spandrel beams, with their asbestos fireproofing, had to be first abated. Once abated, the mechanical systems running in the exterior facades (i.e. the high pressure HVAC ductwork system and the hydronic water system) had to be cut, capped and then abated. Once this work was performed, the steel trash chute opening on each floor could be constructed, the openings in the facades could be demolished and the ramps to the trash chutes could be built.

34. The problems preventing the erection of trash chutes were the result of a basic design flaw. When the Government decided on its phasing design plan for the project, they failed to take into consideration the fact that mechanical systems running in the exterior façades fed both the Phase I and Phase II areas of the project. In turn, this meant cutting and capping an HVAC duct line and/or a hydronic water line in the façade of Phase I would disrupt heating and ventilation services in Phase II.

35. Ultimately, the design defect / differing condition relating to the inability to cut and cap façade mechanical systems, precluded the use of exterior trash chutes in all areas of the project. In turn, virtually all of Hudak's interior demolition debris had to be double handled in carts through the building, down the elevators and out to the dumpsters. In addition, as work proceeded and the debris piles became overwhelming, Hudak's was required to use the mechanical riser shafts as "internal trash chutes."

**b. Utility Cut and Cap Impacts**

36. Similar to the cut and cap issues/problems experienced in attempting to perform the façade abatement and demolition work, the cutting and capping of existing utilities was a prevalent problem throughout all interior areas of the Phase I portion of the project. The process of working around live electrical conduits and the concern for safety significantly impacted the ability to perform Hudak's work in an efficient fashion.

37. The same type of problem was also experienced with respect to demolition work in areas where fire sprinklers had not been decommissioned; creating a constant concern/risk of cutting a water filled sprinkler line and flooding portions of the project. Again, this impacted and delayed the performance of Hudak's work in such areas.

**c. Façade Chipping Change Work Impact**

38. Subsequent to the impacts and delays stemming from the façade abatement change work, Hudak's then experienced additional impacts and delays stemming from façade chipping change work, necessitated by the fact the existing concrete slabs were out of plumb which prevented installation of the new exterior pre-cast panels.

39. The performance of this change work continued to cause Hudak's to have to continue its interior demolition work without the benefit of an exterior façade.

**d. Structural Support Impacts**

40. At the Atrium areas of the project in Phase I, portions of the concrete slabs on each floor had to be removed. To do so required installation of a new structural steel support system designed by the Government engineers. However, because the Government's phasing plan design essentially divided the Atrium areas, the new structural steel support system could not be installed in the Phase II occupied area which was necessary to complete the structural support system needed before the concrete slab work in Phase I could be removed.

41. As a result, the demarcation line for the Phase II area of the project had to be relocated so the entire Atrium fell within the Phase I portion of the project. This permitted the structural steel support system to be completely installed before concrete work in Phase I was moved. However, significant delay and disruption resulted to Hudak's demolition work while the Phase II demarcation line was relocated and the structural steel support work (originally required to be located in the Phase II work area) was performed. Hudak's could not perform the concrete removal work on each floor of Phase I until this change work was completed.

**e. Kitchen Pipe Cut and Cap Impacts**

42. When the Area K kitchen area finally became available, another significant delay occurred with respect to the process of cutting and capping existing utilities. This included electrical, mechanical and water services, all of which had to be disconnected before abatement and demolition work could proceed.

43. With respect to the domestic water lines in the kitchen, a design defect / differing condition was discovered that could not have been reasonably anticipated. In order to cut and cap the domestic water lines in the kitchen, water service to an adjacent building had to be drained and disconnected because it was the water service in the adjacent building that fed the domestic water service in the kitchen area of the Project. Several months of time were lost debating who and how this work should be performed: Ultimately, instead of draining the domestic water lines in the adjacent building, the water lines were temporarily frozen long enough to permit the cutting and capping of water lines in the kitchen area.

**f. The Affect of the Demolition Impact Issues**

44. As with Hudak's abatement work, the piecemeal performance of Hudak's demolition work was also subject to significant change work, which in turn, impacted performance of Hudak's unchanged based contract work. Further, because Hudak's demolition work followed Hudak's abatement work, the changes to Hudak's abatement work and piecemeal performance of the abatement work had a corresponding impact on Hudak's demolition work.

45. The impacted demolition labor overrun hours (resulting from demolition impact issues) on a monthly basis for both Claim Periods 2 and 3 are illustrated below:

| | Period Two | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | |
| **Demolition** | | | | | | | | | | |
| | **Nov-2003** | **Dec-2003** | **Jan-2004** | **Feb-2004** | **Mar-2004** | **Apr-2004** | **May-2004** | **Jun-2004** | **Jul-2004** | **Aug-2004** |
| Actual Hours | 4,422 | 3,846 | 6,654 | 7,732 | 9,559 | 7,645 | 6,460 | 7,871 | 3,568 | 4,441 |
| Change Order Hours | 1,164 | 0 | 72 | 2,317 | 1,736 | 393 | 0 | 0 | 1,998 | 108 |
| Adjusted Actual Hours | 3,259 | 3,846 | 6,582 | 5,415 | 7,823 | 7,253 | 6,460 | 7,871 | 1,570 | 4,333 |
| | | | | | | | | | | |
| % Complete | 4.14 % | 1.34% | 11.18 % | 2.93% | 17.54 % | 8.65% | 6.25% | 4.11% | 3.83 % | 6.38 % |
| Earned Hours | 2,427 | 786 | 6,555 | 1,718 | 10,284 | 5,071 | 3,664 | 2,410 | 2,246 | 3,741 |
| | | | | | | | | | | |
| **Demolition Over Run Hours** | **(831)** | **(3,060 )** | **(27)** | **(3,697 )** | **2,461** | **(2,181 )** | **(2,796 )** | **(5,461 )** | **676** | **(592)** |
| | | | | | | | | | | |
| | | | | | | | | | | |
| **Adjusted Actual Hours** | **54,411** | | | | | | | | | |
| | | | | | | | | | | |
| **Earned Hours** | **38,901** | | | | | | | | | |
| | | | | | | | | | | |
| **Overrun Hours** | **(15,510)** | | | | | | | | | |

| | Period Three | | | |
|---|---|---|---|---|
| | | | | |
| **Demolition** | | | | |
| | **Sep-2004** | **Oct-2004** | **Nov-2004** | **Dec-2004** |
| Actual Hours | 6,388 | 6,521 | 4,505 | 2,355 |
| Change Order Hours | 80 | 160 | 729 | 0 |
| Adjusted Actual Hours | 6,308 | 6,361 | 3,776 | 2,355 |
| | | | | |
| % Complete | 7.77% | 3.34% | 1.55% | 0.17% |
| Earned Hours | 4,556 | 1,958 | 909 | 100 |
| | | | | |
| **Demolition Over Run Hours** | **(1,752)** | **(4,403)** | **(2,867)** | **(2,255)** |
| | | | | |
| | | | | |
| **Adjusted Actual Hours** | **18,800** | | | |
| | | | | |
| **Earned Hours** | **7,522** | | | |
| | | | | |
| **Overrun Hours** | **(11,278)** | | | |

46. Pursuant to the Contract's Dispute clause and the Contract Disputes Act, on July 7, 2006, Hensel Phelps submitted its Certified Claim requesting a Contracting Officer's Final Decision on this matter.

47. All conditions precedent for the filing of this action have been satisfied, waived and/or excused.

**COUNT I**

48. The allegations contained in paragraphs 1 through 47 above are incorporated by reference as through fully set forth herein.

49. In contracting with Hensel Phelps the Government impliedly warranted the adequacy of there Project design, including the phasing design, was suitable for its intended purpose. This implied warranty has been breached by the Government.

50. In addition, the Government owed a duty to Hensel Phelps not to disrupt and/or interfere with the work of Hensel Phelps, including the work of Hensel Phelps' subcontractor, Hudaks. This duty has been breached by the Government.

51. In accordance with the Prime Contract Differing Site Conditions clause, the Government is required to provide an equitable adjustment for the additional costs stemming from differing conditions encountered on the Project. The Government has failed to comply with this Prime Contract clause.

52. In accordance with the Prime Contract Changes clause, the Government is required to provide an equitable adjustment for additional costs caused by any change to the performance of any part of the work, whether or not changed by such change order. The Government has failed to comply with this Prime Contract clause.

53. As a result of the a foregoing and pursuant to Prime the Contract, Hensel Phelps, is entitled to an equitable adjustment in the amount of $766,352, plus contractually allowed mark-up thereon, for the additional costs stemming from the impacts and disruptions to Hudak's abatement and demolition work, caused by the Government during Phase 1 of the Project.

54. As such, the Government is liable to Hensel Phelps for $766,352, plus contractually allowed mark-up thereon, and interest thereon as allowed by the Contract Disputes Act.

**WHEREFORE**, Plaintiff, Hensel Phelps Construction Company for the use and benefit of Hudak's Construction Services, Inc., demands judgment against Defendant, The United States of America, for award of damages in the amount of $766,352, plus contractually allowed mark-up thereon, together with such other and further relief as this Court deems just and proper, including interest as required by the Contract Disputes Act.

Respectfully submitted,

Roger C. Jones

**HUDDLES, JONES**
**SORTEBERG & DACHILLE, P.C.**
10211 Wincopin Circle, Suite 200
Columbia, Maryland 21044
(301) 621-4120 (Telephone)
(301) 621-4473 (Facsimile)
jones@hjpc.com

Counsel for Plaintiff,
Hensel Phelps Construction Co.

DATED: 11/16/2006