# 1

**Hensel Phelps**
**Construction Co.**

MID ATLANTIC DISTRICT
4437 Brookfield Corporate Drive
Suite 207
Chantilly, Virginia 20151
(703) 828-3200
(703) 802-1580 FAX
Virginia Contractors License # 2701 037554A

July 7, 2006

*Via Federal Express*

Patti Vaughn
Contracting Officer
U.S. General Services Administration
The Strawbridge's Building
20 North Eighth Street
Philadelphia, PA 19107-3191

Re: Repair and Restoration of the SSA Operations Building
GSA Contract No. GS-03P-03-DXC-0024

Subject: Certified Claim Submission
Request for Contracting Officer's Final Decision

Ref: 6/26/2006 Hudak's Construction Services, Inc.
Amended and Re-Certified Claim for Equitable Adjustment
Additional Costs Stemming From Phase I Labor Impact

Dear Ms. Vaughn:

For more than a year, Hensel Phelps has been attempting to work with the GSA to resolve the issue related to the time and cost impacts incurred by Hensel Phelps' demolition and abatement subcontractor, Hudak's Construction Services, Inc. (Hudak), as a result of the Government's act and omissions on the above referenced project. Notwithstanding Hensel Phelps' attempts, GSA has not engaged in any meaningful dialogue that would result in bringing closure to this issue. As a result, Hensel Phelps has elected to exercise its rights under the Contract and the Contract Disputes Act to file a certified claim related to the cost impacts incurred by Hudak.

Hensel Phelps is filing this claim as pass-through on behalf of Hudak. Hudak's June 26, 2006 certified claim submission to Hensel Phelps is enclosed. This submission outlines the basis for entitlement and damages calculations. On behalf of Hudak's, Hensel Phelps claims Phase 1 impact costs related to the events characterized

therein in the total amount of $766,352 plus commission as allowed by the Contract. Hensel Phelps requests that you render a Contracting Officer's Final Decision within sixty (60) days of receipt of this letter. Also, please be advised that this amount does not include any Phase 1 delay costs resulting from those events and Hensel Phelps reserves its rights to seek those costs and appropriate time extensions in a later submission.

I certify that the claim is made in good faith; that the supporting data are accurate and complete to the best of my knowledge and belief; that the amount requested accurately reflects the contract adjustment for which the Contractor believes the Government is liable; and that I am duly authorized to certify the claim on behalf of the Contractor.

Sincerely,

Hensel Phelps Construction Co.

Stan D. Carlat
Operations Manager

Cc: Hudak's Construction Services, Inc.
Todd Metz, Esq.
Roger Jones, Esq.
Jeff d'Agosta, Esq.



REPAIR AND RESTORATION OF THE SSA OPERATIONS BUILDING - HEADQUARTERS CAMPUS
GSA CONTRACT NO. GS-03P-03-DXC-0024

# HUDAK'S CONSTRUCTION SERVICES, INC.

## AMENDED AND RE-CERTIFIED CLAIM FOR EQUITABLE ADJUSTMENT

## ADDITIONAL COSTS AND TIME STEMMING FROM PHASE I IMPACT AND DELAY - $766,352

## REQUEST FOR CONTRACTING OFFICER'S FINAL DECISION

**Submitted: June 26, 2006**

**Hudak's Construction Services, Inc.**

*Architectural, Mechanical and Electrical Demolition*

June 26, 2006

**SENT VIA EXPRESS MAIL**

Hensel Phelps Construction Co.
Mid-Atlantic District
4437 Brookfield Corporate Drive, Suite 207
Chantilly, Virginia 20151

**SENT VIA EXPRESS MAIL**

Hensel Phelps Construction Co.
108 E. Perimeter Drive
Baltimore, Maryland 21207

**Re: Repair and Restoration of the SSA Operations Building**
**Headquarters Campus**
**GSA Contract No. GS-03P-03-DXC-0024**

**Subj: Amended and Re-Certified Claim For Equitable Adjustment**
**Additional Costs Stemming From**
**Phase I Labor Impact - $766,352**

**Request For Contracting Officer's Final Decision**

**Ref: 3/8/06 Certified Claim Submission**
**12/5/05 Merged Claim Analysis**
**11/29/05 Supplemental Claim Information**
**9/30/05 Alternate Claim Analysis and Revised Claim Amount**
**1/6/05 Hudak's Claim Submission**

Gentlemen:

As you are aware, by letter dated January 6, 2005, Hudak's Construction Services, Inc. ("Hudak's"), submitted a Request For Equitable Adjustment / Claim For Additional Costs and Time Stemming From Phase I Impact and Delay, in the total amount of $1,199,664. Thereafter, Hudak's was requested to provide an alternate analysis of its claim submission. This alternate

analysis was prepared in a PowerPoint presentation format and was provided to Hensel Phelps on September 30, 2005. Pursuant to Hudak's alternate analysis, the amount of Hudak's initial claim submission (i.e. $1,199,664), was revised / amended to $1,167,684. On November 29, 2005, Hudak's provided a letter with supplemental claim information in connection with the alternate claim analysis previously submitted. Thereafter, on December 5, 2005, Hudak's presented a "Merged" claim analysis to Hensel Phelps and a designated third-party neutral. When this "Merged" claim analysis did not result in resolution of Hudak's claim, b letter dated March 8, 2006, Hudak's certified its revised/amended claim.

To date, GSA's response to our revised / amended claim submission has, in our opinion, been nonresponsive. Although GSA provided a chronology with respect to the attempted resolution of our claim, by letter dated February 7, 2006, this chronology did not address any of the substantive merits regarding our claim.

In light of this history and to further prosecute our Phase I claim for additional costs against the GSA in accordance with the Prime Contract Disputes Clause and the Contract Disputes Act, Hudak's is once again amending its claim, to an amount which now totals **$766,352**, based on the following revisions:

1. Hudak's has excluded from this amended claim submission our Phase I delay costs in the amount of $164,256. By way of agreement between Hudak's and Hensel Phelps, it is understood these Phase I delay costs will be included by Hensel Phelps in a separate delay cost submission which Hensel Phelps will present to the Government for additional costs stemming from Phase I delays. As such, all rights with respect to these Phase I delay costs are fully reserved.

2. Hudak's has also excluded from this amended claim submission our Phase 1 labor impact costs for demolition and abatement, in the total amount of $237,076, for Phase 1 Claim Periods 1 and 4. By way of agreement between Hensel Phelps and Hudak's, Hensel Phelps has assumed responsibility for Hudak's labor impact costs related to Hudak's abatement and demolition work during Claim Periods 1 and 4. Phase I, Claim Period 1 was between June 1, 2003 and October 31, 2003. Phase I, Claim Period 4, was between January 1, 2005 and June 30, 2005.

Based on these revisions, the additional costs which Hudak's is continuing to pursue against the Government for impact to our abatement and demolition labor productivity during Phase I, Claim Periods 2 and 3, totals **$766,352**, as follows (and as itemized in **EXHIBIT A**):

| Abatement | | | Demolition | | |
|---|---|---|---|---|---|
| **Impact Costs:** | | | **Impact Costs:** | | |
| Period 2: | 11/1/03 - 8/31/04 | $95,610 | Period 2: | 11/1/03 - 8/31/04 | $341,800 |
| Period 3: | 9/1/04 - 12/31/04 | $80,404 | Period 3: | 9/1/04 - 12/31/04 | $248,538 |
| **Subtotal** | | **$176,014** | **Subtotal** | | **$590,338** |

**Total Claimed Costs** **$766,352**

As noted above, Hudak's has re-certified this amended claim submission and Hudak's is requesting Hensel Phelps to submit this certified claim submission to the Government (along with Hensel Phelps' required claim certification) and request a Final Decision by the Contracting Officer regarding this claim. Given the fact that nearly 18 months have past since Hudak's first submitted its initial Request For Equitable Adjustment and given the fact the Government is unwilling to submit our claim to any type of ADR with a third party neutral, it is clear to Hudak's this matter is at "impasse". As such, Hudak's fully intends to pursue this matter, as a pass through claim against the Government, in accordance with the Prime Contract Disputes Clause and the Contract Disputes Act.

**Entitlement Overview – Revised**

The facts and circumstances given rise to the impact, disruption and delay to our Phase I subcontract performance are numerous. Some of the largest factors include: (1) the Government's failure to provide work areas in accordance with the plan schedule; (2) differing conditions not shown on the contract drawings and of a type not normally expected in this type o construction; and (3) uncontemplated piecemeal performance of work stemming from the Government's failure to properly plan and phase the decommissioning of mechanical, plumbing, life safety, sprinkler and electrical services within the Phase I work area.

**A. Hudak's Planned Performance**

To fully understand the problems that impacted and delayed our work, it is important to recognize the original plan upon which our work was bid and upon which our subcontract was premised. Simply stated, Hudak's reasonably contemplated performing abatement and demolition work in large areas of the project at one time. In this regard, Part I of Specification Section 01010, ¶1.3, indicated the contractor would have full use of the designated construction area for each phase of the work.

As planned, the duration for our Phase I abatement and demolition work was to span the course of one year, from October 20, 2003 to October 20, 2004 (i.e. 367 calendar days). Hudak's believed the overall duration for its abatement and demolition work in each area, and for Phase I as a whole, was adequate and reasonable. Hudak's also believe its work would proceed in an orderly, efficient and timely fashion. To do so, the following was of paramount importance:

1. Having almost totally unfettered access to the entire Phase I area of the building;

2. Having utilities "cut and capped" ahead of Hudak's demolition work;

3. Having an exterior trash chute installed at the outset of demolition activities; and

4. Having the ability to perform abatement and demolition activities in a contiguous and continuous fashion.

Pursuant to the Government's phasing plan, the Phase I work area for the project was divided into several sub-areas, depicted as follows:




In accordance with Hensel Phelps baseline schedule, our work in areas H, F, D & B was planned to be performed between early November 2003 and mid May 2004. Thereafter the Area K and J (Kitchen Areas) abatement and demolition work was planned to be performed between mid August 2004 and late October 2004. The sequence of Hudak's work was to be: (1) Pre-Abatement Demolition; (2) Abatement; and (3) Demolition. Also, work was to be performed in interior spaces first; followed by demolition of exterior walls.

### B. Hudak's As-Built Performance

As Hensel Phelps and the Government are fully aware, our work on the project did not proceed as expected or planned. Nor did our work proceed as was envisioned in the baseline schedule. Instead, our work had to be performed in a disrupted, piecemeal, out-of-sequence, delayed and inefficient fashion. In addition, our work was subjected to a multitude of Government changes, which had a cumulative impact on our ability to perform our base contract work in an efficient fashion.

Hensel Phelps Construction Co.
June 26, 2006
Page 5

Although our abatement and demolition work substantially commenced in November 2003, this work continued through December 2004; contrary to the plan for our Phase 1 work, which should have been complete by late October 2004. The time frame between November 2003 and December 2004 has been analyzed and broken down into two distinct claim periods:

Claim Period 2: November 1, 2003 through August 31, 2004; and

Claim Period 3: September 1, 2004 through December 31, 2004.[1]

For purposes of this claim submission, the following illustrates the sub-phase work areas affected during different periods of our Phase I work. We have highlighted the Claim Period 2 and Claim Period 3 affected work areas since they are now the central focus of the additional costs we incurred stemming from impact to our labor productivity.




[1] Claim Period 1, which is now excluded from this claim submission, was during the time frame between June 1, 2003 and October 31, 2003. Likewise, Claim Period 4, which is now excluded from this claim submission spanned the time frame from January 1, 2005 through June 30, 2005.

In addition, the Phase I work included certain Atria work, illustrated below, which were part of the Period 2 affected work areas.




The impact factors on our abatement and demolition work were numerous and are described herein. As the Government is aware, the defective design with respect to the Government's phasing scheme and the numerous differing conditions encountered, resulted in an enormous amount of changes. By far, the cumulative impact from these changes was devastating to our ability to perform work in an efficient and productive fashion.

In a study on construction changes and change orders, published by The Construction Industry Institute,[2] it was noted:

> When there are multiple changes on a project and they act in a sequence or concurrently there is a compounding effect – this is the most damaging consequence for a project and the most difficult

[2] Weston T. Hester, John A. Kuprenas, & T.C. Chang, *Construction Changes and Change Orders: Their Magnitude and Impact*, Construction Industry Institute, Source Document 66 (Oct. 1991), p35.

> to understand and manage. The net effect of the individual changes is much greater than a sum of the individual parts. Not only may there be increases in cost and time required, but the project logic may have to be redone.

On Government contracts, additional costs and damages stemming from impact to labor productivity, such as the costs claimed herein, have been awarded in numerous decisions. As both Hensel Phelps and the GSA are aware, one of the more recent decisions of this type was in *Hensel Phelps Construction v. General Services Administration,* GSBCA No. 14,744, 01-1 BCA (CCH) ¶ 31,249 (2001), *aff'd sub nom.,* Perry v. Hensel Phelps Constr. Co., 36 Fed. Appx. 649 (Fed. Cir. 2002).

In the *Hensel Phelps* case, Hensel Phelps was the prime contractor for construction of an office building and laboratory for the National Oceanic and Atmospheric Administration (NOAA). During construction, Hensel Phelps was directed by NOAA to have its mechanical contractor install vibration isolation on a portion of the piping and plumbing in the project. The subcontractor pursued a claim for the cost of this change work and also pursued a separate claim for lost productivity on the unchanged portion of the work as a result of the change work. Although the Government contended there should be no recovery, the court disagreed. The changes clause in the contract (the same as in the SSA contract) required an adjustment of the contract price to reflect increases in the contractor's cost of performing work, "whether or not that work is changed" by the contracting officer's change order.

1. **Impacted Abatement Work:**

Commencing in mid-November 2003, Hudak's was able to begin limited abatement work in Area H. On a planned basis, the abatement work in Area H should have proceeded in the entire area at the same time. However, work could not proceed in this fashion because pre-abatement work could not be completed due to the inability to cut and cap existing mechanical and electrical systems in order to make the area safe for abatement (and subsequent demolition). This was due to the fact the mechanical and electrical services serving Area G in the Phase II portion of the project ran through Area H in the Phase I portion of the project. Further, the cut and cap process was impacted by the Government's need for a two-week notice before any systems could be shut down for cutting and capping purposes. Hudak's understands this was contrary to the 72-hour notice in Hensel Phelps' prime contract.[3]

These two impact factors required the abatement process in Areas H, D and B to be performed in small sections at a time, which became available in a piecemeal fashion. In turn, the piecemeal nature of the abatement process necessitated performing demolition work in an equally piecemeal fashion, side-by-side with the abatement work throughout Phase I as areas became available.

[3] See Specification Section 01040, Part 1, Paragraph 1.9.

This highly segmented and inefficient sequence of work resulted in yet additional impact stemming from construction dust permeating abatement containment areas. In turn, this caused a great deal of retesting and recleaning of abatement areas; resulting in both additional cost to both Hudak's and the Government's testing agency. It also caused a significant time impact in terms of our ability to perform abatement work and subsequent demolition work in accordance with the baseline schedule and in any sort of efficient fashion. Simply stated, until an abatement area was deemed acceptable by the Government's testing agency, subsequent demolition work in the area could not proceed.

**a. Cumulative Impact Stemming From Abatement Change Work**

Compounding the requirement to perform our abatement work in this piecemeal process, was also the fact that significant abatement change work had to be performed due to differing conditions. In turn, the performance of this change work impacted the performance of our unchanged base contract work. The charts below illustrate the months during Claim Periods 2 and 3 where excessive change work had to be performed at the same time as our base contract work.

| | **Period Two** | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | |
| **Abatement** | | | | | | | | | | |
| | **Nov-2003** | **Dec-2003** | **Jan-2004** | **Feb-2004** | **Mar-2004** | **Apr-2004** | **May-2004** | **Jun-2004** | **Jul-2004** | **Aug-2004** |
| Actual Hours | 3,631 | 6,621 | 4,845 | 4,758 | 6,290 | 4,620 | 4,308 | 2,668 | 1,202 | 3,286 |
| Change Order Hours | 50 | 1,150 | 872 | 1,031 | 1,997 | 739 | 786 | 167 | 0 | 0 |
| Adjusted Actual Hours | 3,581 | 5,471 | 3,973 | 3,727 | 4,293 | 3,882 | 3,523 | 2,501 | 1,202 | 3,286 |
| | | | | | | | | | | |
| % Complete | 8.56% | 18.53% | 13.69% | 10.97% | 20.94% | 9.19% | 1.56% | 0.89% | 0.86% | 1.18% |
| Earned Hours | 3,116 | 6,745 | 4,983 | 3,993 | 7,622 | 3,345 | 568 | 324 | 313 | 430 |
| | | | | | | | | | | |
| **Abatement Over Run Hours** | **(465)** | **1,274** | **1,010** | **266** | **3,329** | **(536)** | **(2,955)** | **(2,177)** | **(889)** | **(2,856)** |
| | | | | | | | | | | |
| | | | | | | | | | | |
| **Adjusted Actual Hours** | **35,438** | | | | | | | | | |
| | | | | | | | | | | |
| **Earned Hours** | **31,439** | | | | | | | | | |
| | | | | | | | | | | |
| **Overrun Hours** | **(3,999)** | | | | | | | | | |

| | Period Three | | | |
|---|---|---|---|---|
| | | | | |
| **Abatement** | | | | |
| | **Sep-2004** | **Oct-2004** | **Nov-2004** | **Dec-2004** |
| Actual Hours | 5,352 | 2,758 | 1,410 | 480 |
| Change Order Hours | 0 | 751 | 440 | 493 |
| Adjusted Actual Hours | 5,352 | 2,008 | 970 | (13) |
| | | | | |
| % Complete | 7.64% | 5.03% | 0.66% | 0.28% |
| Earned Hours | 2,781 | 1,831 | 240 | 102 |
| | | | | |
| **Abatement Over Run Hours** | **(2,571)** | **(177)** | **(730)** | **114** |
| | | | | |
| | | | | |
| **Adjusted Actual Hours** | **8,317** | | | |
| | | | | |
| **Earned Hours** | **4,954** | | | |
| | | | | |
| **Overrun Hours** | **(3,363)** | | | |

Some of the more significant changes that affected our abatement work, included the following:

(i) **Façade Abatement Change Work:**

As the Government and Hensel Phelps are aware, the contract documents for the project did not identify how much, if any, exterior block wall abatement work would have to be performed. Likewise, they did not indicate how such abatement work would be performed if, in fact, it was necessary.

Ultimately, when it was decided that all of the exterior block wall would be abated, the change work to perform this abatement had a significant impact on our other contract work. First, the demolition work of the existing brick veneer had to be performed in its own separate sequence in order to have access to both sides of the exterior block wall for abatement purposes. Then, scaffolding and enclosure of the exterior block wall was required. When this process became too time consuming, Hudak's was directed to abate the exterior block wall from the inside of the building. Further, demolition of the brick veneer and abatement of the block wall had to be performed in a sequence that was not productive for performing the interior abatement and demolition work.

Due to the alleged need for immediate erection of exterior precast, Hudak's was directed to perform the exterior wall demolition and abatement prior to performing interior abatement and demolition. Given the nature of demolition work, it is important (and standard practice) to

contain an area where demolition work is being performed so that it is not subject to weather elements as the work is being performed. On this project, however, the opposite occurred in order to facilitate the time consuming exterior block wall change work. Instead of performing the interior abatement and demolition work before the façade abatement and demolition work, the façade abatement and demolition work had to proceed first. In turn, this meant Hudak's interior abatement and demolition work was subject to weather elements and winter working conditions, which contributed to the labor impacts that were experienced by our work crews.

**(ii) Raised Access Flooring Abatement Work:**

Another significant abatement change involved approximately 40,000 square feet of raised access flooring that was determined to have asbestos tiles. The performance of this change work as well as our follow-on base contract work was seriously disrupted by the existence of electrical conduit and cabling under the raised access floors. In order to abate the raised access floors, Hudak's had to go through a time consuming process of having each conduit and cable checked and decommissioned, which substantially prolonged not only the performance of the abatement change work but also the follow-on demolition work. By letter dated January 23, 2004 (**EXHIBIT B-1**), Hudak's advised of the delay this issue was causing.

In addition, as Hudak's was performing the raised access flooring abatement change work, it also became necessary to perform change work to abate existing carpet on top of the raised access floor, which could not be separated from the asbestos containing floor tiles.

By letter dated January 7, 2004 (**EXHIBIT B-2**), Hudak's reiterated the impact effects due to these problems. Further, we advised that these activities would be monitored to ascertain any negative impacts on the project schedule and cost impacts.

**b. The Affect of the Abatement Impact Issues**

The illustration below graphically shows the impact affect on our abatement work activities. During the months of December 2003 and January through April 2004, a large amount of change work was performed. The earned labor hours stemming from the performance of this change work caused an actual labor hour under-run during this period. As can be seen, however, when the performance of change work tapered off in the late spring and summer of 2004, the effect of the cumulative impact stemming from the change work caught up with our base contract work; resulting in a significant labor hour overrun each month through the summer of 2004.




The loss of labor productivity with respect to our abatement work activities and the cumulative impact stemming from Government directed changes continued right on through Claim Period 3. In fact, when the Area J &K Kitchen work areas became available in the fall of 2004, a large amount of abatement change work again had to be performed during October, November and December. As a result, Hudak's again experienced a significant labor overrun during this period, as illustrated in the chart below:




## 2. Impacted Demolition Work:

Like the impact and delay experienced in performing our abatement work, our demolition work was also disrupted, impacted and delayed by several factors.

### a. Lack of Trash Chute Impact:

At the time Hudak's bid the work for this project, it was contemplated that trash chutes would be erected[4] on the South side of Area H and the West wall of Area D. The contemplated use of trash chutes on these facades was critical for both timely and efficient performance of our demolition work. Without trash chutes, all demolition debris had to be carted to an elevator, transported to the ground level and then carted to a dumpster. The handling of debris in such a fashion was extremely time consuming and labor intensive. It is much easier to dump a wheelbarrow of debris out a large opening in a façade and have it fall through a trash chute, directly into a dumpster, than it is to manipulate a wheelbarrow full of debris through hallways and elevators, that are being utilized by other trades, and out to a dumpster.

[4] See Specification Section 01040, Part 3, Paragraph 3.4.E.

To construct the trash chutes, Hudak's needed to erect a vertical steel frame on each floor running from floor slab to ceiling slab. To do so, the façade spandrel beams, with their asbestos fireproofing, had to be first abated. Once abated, the mechanical systems running in the exterior facades (i.e. the high pressure HVAC ductwork system and the hydronic water system) had to be cut, capped and then abated. Once this work was performed, the steel trash chute opening on each floor could be constructed, the openings in the facades could be demolished and the ramps to the trash chutes could be built.

By letter dated June 23, 2003 (**EXHIBIT B-3**) Hudak's first inquired about installation of the trash chutes. This was then followed-up by letter dated July 23, 2003 (**EXHIBIT B-4**). Thereafter, by letter dated September 16, 2003 (**EXHIBIT B-5**), Hudak's again inquired about installation of the trash chute.

The problems preventing the erection of trash chutes were the result of a basic design flaw. When the Government decided on its phasing plan for the project, apparently they failed to take into consideration the fact that mechanical systems running in the exterior façades fed both the Phase I and Phase II areas of the project. In turn, this meant that cutting and capping an HVAC duct line and/or a hydronic water line in the façade of Phase I would disrupt heating and ventilation services in Phase II.

By letter dated October 15, 2003 (**EXHIBIT B-6**), Hudak's advised the delay associated with installation of the trash chute would impact and delay all abatement and demolition work. A follow-up letter, again providing notice of this impact and delay, was subsequently sent on October 20, 2003 (**EXHIBIT B-7**). Thereafter, Hudak's letter of October 28, 2003 (**EXHIBIT B-8**) even attempted to estimate the potential impact costs. This estimate turned out to pale in comparison to the actual costs.

Ultimately, the design defect / differing condition relating to the inability to cut and cap façade mechanical systems, precluded the use of exterior trash chutes in all areas of the project. In turn, virtually all of our interior demolition debris had to be double handled in carts through the building, down the elevators and out to the dumpsters. In addition, as work proceeded and the debris piles became overwhelming, Hudak's was required to use the mechanical riser shafts as "internal trash chutes". Of course, this impacted mechanical and HVAC duct riser work, but Hudak's had no other way of expeditiously removing demolished debris from the numerous building levels in our Phase I work.

**b. Utility Cut and Cap Impacts:**

Similar to the cut and cap issues/problems we experienced in attempting to perform the façade abatement and demolition work, the cutting and capping of existing utilities was a prevalent problem throughout all interior areas of the Phase I portion of the project. In this regard, the process of working around live electrical conduits and the concern for safety significantly impacted the ability to perform our work in an efficient fashion.

The same type of problem was also experienced with respect to demolition work in areas where fire sprinklers had not been decommissioned; creating a constant concern/risk of cutting a water filled sprinkler line and flooding portions of the project. By letter of December 15, 2003 (**EXHIBIT B-9**) Hudak's advised the Government that due to this concern work would not proceed in areas where fire sprinkler lines had not been decommissioned. Of course this had the effect of impacting and delaying the performance of our work in these areas.

The perfect example of our concern resulted on January 22, 2004. As advised in our letter of January 23, 2004 (**EXHIBIT B-10**), a sprinkler line that had been marked "green" for demolition purposes had not been properly decommissioned and Hudak's entire crew was required to stop work in order to clean up water generated by the event. As in our other correspondence, this letter indicated costs and delays associated with the down time would be submitted.

Thereafter, by letter dated February 5, 2004 (**EXHIBT B-11**), Hudak's advised of an incident that occurred where a "live" electrical line was marked for demolition; resulting in our worker being sent for medical treatment. This was simply an unacceptable work condition which had the continuing effect of impacting, delaying and disrupting the performance or our demolition work. Moreover, the push to recover lost time stemming from excusable delays compounded the problem; impacting production out of concern for injury and possible loss of life. Our letter of November 23, 2004 (**EXHIBIT B-12**), advised that demolition of "live" electrical line in areas where demolition of water filled pipes was occurring, was a dangerous situation that was beyond, "plain common sense."

**c. Façade Chipping Change Work Impact:**

Subsequent to the delays stemming from the façade abatement change work, Hudak's then experienced additional delays stemming from façade chipping change work, necessitated by the fact the existing concrete slabs were out of plumb which prevented installation of the new exterior panels.

The performance of this change work simply added to the impact and delay caused by the abatement of the exterior block walls. It also caused Hudak's to have to continue its interior demolition work without the benefit of an exterior façade.

**d. Structural Support Impacts:**

At the Atrium area of the project in Phase I, portions of the concrete slabs on each floor had to be removed. To do so required installation of a new structural steel support system designed by the Government engineers. However, because the Government's phasing plan essentially divided the Atrium area, the new structural steel support system could not be installed in the Phase II occupied area which was necessary to complete the structural support system needed before the concrete slab work in Phase I could be removed.

As a result, the demarcation line for the Phase II area of the project had to be relocated so the entire Atrium fell within the Phase I portion of the project. This permitted the structural steel support system to be completely installed before concrete work in Phase I was moved. However, significant delay resulted to Hudak's while the Phase II demarcation line was relocated, the structural steel work (originally in Phase II) was performed, the abatement and demolition work was performed after the Phase II demarcation line was moved. Not before this work was complete, could Hudak's finally perform the concrete removal work on each floor of Phase I.

Perhaps the best evidence of the impact relating to this issue is set forth in Hensel Phelps' "Phase II plan for demarcation between occupied and construction areas" dated July 12, 2004 (included as **EXHIBIT B-13**). This Hensel Phelps document states, in pertinent part:

> During the initial stages of this project, much discussion took place as to the exact location of the temporary barrier wall constructed to separate the occupied and construction sides of the building. **Ultimately, the exact location of the barrier wall was dictated by the Government and remains as currently located today. As a result certain inherent elements of the design were not coordinated with the actual location of this barrier wall. For example, the location of the temporary barrier wall did not allow for new installation of structural steel at the linear atria during the course of Phase I construction. Specifically, the current location of SSA's Print Shop (near K-line on the 2nd Floor) forced the temporary barrier wall further West then originally planned. This location of the temporary barrier wall did not allow for the installation of the structural steel as designed to support the new atria cut-out. This situation has been further complicated by the additional requirement of the Structural Engineer to install an elaborate series of post shores for supplemental temporary support of the area in question.**
>
> * * *
>
> Currently, we have been presented with a preliminary plan for supplemental structural support which will require approximately 50+ post shores to be installed on the 1st Floor within the limits of two of the spaces SSA needs most upon completion of Phase I, the M.E.R. and the Self-Service Store. If the aforementioned rooms are to be turned over to the Government with the balance of Phase I spaces, this supplemental structural support must be redesigned.

See **EXHIBIT B-13**, Page 1 and 6.

This design defect arose primarily due to the Government's failure to properly design its building phasing plan. It illustrates perfectly how the Government's defective phasing plan for

the project has not only delayed and extended the Phase I contract performance, but also impacted the ability to efficiently and timely perform work in the Phase I work areas.

**e. Kitchen Pipe Cut and Cap Impacts:**

Although the baseline schedule contemplated a "down time" during the period between mid-May and mid-August 2004 when demolition in Area J and Area K would proceed, due to the delays discussed above, this brief down time in the performance of our work activities never occurred. Rather, Hudak's was required to continue performing demolition work right through the Summer of 2004. When the Area K kitchen area finally became available, another significant delay occurred with respect to the process of cutting and capping existing utilities. This included electrical, mechanical and water services, all of which had to be disconnected before abatement and demolition work could proceed.

By letter dated November 23, 2004 (**EXHIBIT B-14**), Hudak's advised that until all utilities in the kitchen area had been cut, capped and otherwise made safe, Hudak's was removing its crew from the kitchen area due to life safety concerns. Our letter indicated the kitchen area should have been ready for demolition by August 16, 2004 and, as of November 23, 2004 this was not the case. We also indicated the additional costs and time stemming from this type of problem, would have to be compensated.

With respect to the domestic water lines in the kitchen, a design defect / differing condition was discovered that could not have been reasonably anticipated. In order to cut and cap the domestic water lines in the kitchen, water service to an adjacent building had to be drained and disconnected because it was the water service in the adjacent building that fed the domestic water service in the kitchen area of the project. Several months of time were lost debating who and how this work should be performed. Ultimately, instead of draining the domestic water lines in the adjacent building, the water lines were temporarily frozen long enough to permit the cutting and capping of water lines in the kitchen area.

**f. The Affect of the Demolition Impact Issues**

As with our abatement work, the piecemeal performance of our demolition work was also subject to significant change work, which in turn, impacted performance of our unchanged based contract work. Further, because our demolition work followed our abatement work, the changes to our abatement work also had a corresponding impact on our demolition work. Since the abatement work was being performed in a piecemeal fashion and since the demolition work could not be done until the abatement work was complete, our demolition work also proceeded in a piecemeal fashion; allowing us to complete only small areas at a time – instead of large areas on each level.

The charts below show the demolition overrun labor hours (resulting from impact issues) on a monthly basis for both Claim Periods 2 and 3. Note the substantial amount of change work hours expended in the February through April 2004 time period associated with the chipping of concrete slabs at the exterior facades, among other things.

| | Period Two | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | |
| **Demolition** | | | | | | | | | | |
| | **Nov-2003** | **Dec-2003** | **Jan-2004** | **Feb-2004** | **Mar-2004** | **Apr-2004** | **May-2004** | **Jun-2004** | **Jul-2004** | **Aug-2004** |
| Actual Hours | 4,422 | 3,846 | 6,654 | 7,732 | 9,559 | 7,645 | 6,460 | 7,871 | 3,568 | 4,441 |
| Change Order Hours | 1,164 | 0 | 72 | 2,317 | 1,736 | 393 | 0 | 0 | 1,998 | 108 |
| Adjusted Actual Hours | 3,259 | 3,846 | 6,582 | 5,415 | 7,823 | 7,253 | 6,460 | 7,871 | 1,570 | 4,333 |
| | | | | | | | | | | |
| % Complete | 4.14% | 1.34% | 11.18% | 2.93% | 17.54% | 8.65% | 6.25% | 4.11% | 3.83% | 6.38% |
| Earned Hours | 2,427 | 786 | 6,555 | 1,718 | 10,284 | 5,071 | 3,664 | 2,410 | 2,246 | 3,741 |
| | | | | | | | | | | |
| **Demolition Over Run Hours** | **(831)** | **(3,060)** | **(27)** | **(3,697)** | **2,461** | **(2,181)** | **(2,796)** | **(5,461)** | **676** | **(592)** |
| | | | | | | | | | | |
| | | | | | | | | | | |
| **Adjusted Actual Hours** | **54,411** | | | | | | | | | |
| | | | | | | | | | | |
| **Earned Hours** | **38,901** | | | | | | | | | |
| | | | | | | | | | | |
| **Overrun Hours** | **(15,510)** | | | | | | | | | |

| | Period Three | | | |
|---|---|---|---|---|
| | | | | |
| **Demolition** | | | | |
| | **Sep-2004** | **Oct-2004** | **Nov-2004** | **Dec-2004** |
| Actual Hours | 6,388 | 6,521 | 4,505 | 2,355 |
| Change Order Hours | 80 | 160 | 729 | 0 |
| Adjusted Actual Hours | 6,308 | 6,361 | 3,776 | 2,355 |
| | | | | |
| % Complete | 7.77% | 3.34% | 1.55% | 0.17% |
| Earned Hours | 4,556 | 1,958 | 909 | 100 |
| | | | | |
| **Demolition Over Run Hours** | **(1,752)** | **(4,403)** | **(2,867)** | **(2,255)** |
| | | | | |
| | | | | |
| **Adjusted Actual Hours** | **18,800** | | | |
| | | | | |
| **Earned Hours** | **7,522** | | | |
| | | | | |
| **Overrun Hours** | **(11,278)** | | | |

Like our abatement work, the illustration below graphically shows the impact affect on our demolition work activities. Unlike our abatement work, however, during the months of December 2003 and January through April 2004, when a large amount of abatement change work was performed there is a dramatic labor hour impact / overrun associated with our demolition work. As indicated above, this is because the abatement changes had a corresponding impact on our demolition work, since the abatement had to be performed first before demolition work could follow in a piecemeal fashion.

Then, our earned labor hours, in the March / April 2004 time frame, stemming from the performance of the façade slab chipping change work (which followed the façade abatement change work), caused an actual labor hour under-run during this time frame. However, when the performance of change work tapered off in May of 2004, the effect of the cumulative impact stemming from the change work caught up with our base contract work; resulting in a significant labor hour overrun in both May and June of 2004.



After the summer of 2004, when the J and K kitchen areas became available, and the utility cut and cape impacts resumed, the illustration below shows a corresponding labor impact / overrun through December of 2004.




## C. Conclusion

The Phase I portion of this project for Hudak's was an absolute nightmare. What should have been a simple abatement and demolition project was plagued with differing conditions, changes and multiple disruptions due to a negligent and deficient Government phasing design. Despite these obstacles, the work of Phase I is completed. Therefore, the costs and damages which have been financed and expended must be paid. If not, the effect of nonpayment will have a direct and correlating impact on the performance of our Phase II work, which is just now proceeding.

**Certification**

In accordance with the Contract Disputes Act:

I certify that this claim is made in good faith; that the supporting data are accurate and complete to the best of my knowledge and belief; that the amounts requested accurately reflect the contract adjustment for which the Contractor believes the Government is liable; and that I am duly authorized to certify the claim on behalf of the Contractor.

Sincerely,

**HUDAK'S CONSTRUCTION SERVICES, INC.**

Dup ocis

~~Timothy~~ Hudak
President

Enclosures
cc: Roger C. Jones, Esquire (w/encs.)
Paul L. Stynchcomb (w/encs.)
Todd Metz, Esquire (w/encs.)